1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10
11

OWEN FRANKLIN,

)   Case No. ED CV 11-01978- MWF (SPx)

12

                         Plaintiff,

)
)   **FINDINGS OF FACT AND**

13

          v.

)   **CONCLUSIONS OF LAW**
)

14

)

15

UNITED PARCEL SERVICE, INC.,

)
)

16

                         Defendants.

)
)

17

)

18

)
)

19

_____

20

    This matter came on for trial before the Court sitting without a jury on February 12,

21

February 13, February 14, February 19, and February 20, 2013.   Following the

22

presentation of evidence, the parties filed supplemental briefs (Docket Nos. 72 and 73)

23

and made their closing arguments.   (Docket No. 74).   The matter was then taken under

24

submission.

25

    Having carefully reviewed the record and the arguments of counsel, as presented at

26

the hearing and in their written submissions, the Court now makes the following findings

27

of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal

28

Rules of Civil Procedure.   Any finding of fact that constitutes a conclusion of law is also

hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I. <u>FINDINGS OF FACT</u>

1. Plaintiff Owen Franklin is an individual and citizen of the State of California.

2. Defendant United Parcel Service, Inc. ("UPS") is a corporation duly organized and existing under the laws of the State of Ohio with its principal place of business in the State of Georgia.

**A. Franklin is Employed by UPS as a Feeder Driver**

3. Franklin began work with UPS in 1989 and was promoted to the position of Feeder Driver in May 2004.

4. Feeder Drivers drive semi-tractor trailers pulling UPS trailers between UPS customers and UPS sites. The trucks driven by Feeder Drivers weigh approximately 80,000 pounds.

5. In conjunction with the International Brotherhood of Teamsters, UPS prepared a written job description for the Feeder Driver position, dated January 1, 2008. (Ex. 15). The written job description contains a list of duties and functions UPS considers essential to the Feeder Driver position.

6. The bidding process and certain other aspects of the Feeder Driver job are governed by a collective bargaining agreement ("CBA") between the Teamsters and UPS. (Ex. 12). Franklin is a member of Teamsters Local No. 63.

7. Feeder Driver qualifications are also determined in part by the United States Department of Transportation.

8. As a Feeder Driver, Franklin did not have an assigned route (or run) but instead bid on weekly runs based on his seniority, pursuant to the CBA. Feeder Drivers without assigned routes, like Franklin, are referred to as "Dispatch Drivers" or "Cover Drivers." Cover Drivers working normal bid runs usually fill in on established routes when regular drivers are not working due to planned absences. Cover Drivers working as directed ("WAD") handle established routes when regular drivers are not working due to

unplanned absences.  When bidding on normal runs, Cover Drivers receive only the run number, the start time, and the name of the driver whose route requires coverage.  When bidding on WAD runs, Cover Drivers are only given the run's start time.  There are three types of runs – local, sleeper, and night runs – in addition to WAD.

9.    Before and after runs, Feeder Drivers are sometimes required to maneuver and manipulate dolly equipment to connect and disconnect trailers.  There are occasionally other UPS employees available to manipulate dollies, but Feeder Drivers must hook up their own trailers using dollies on a regular basis.

10.    Connecting and disconnecting trailers using a dolly involves lifting the arm of the dolly from the ground to the level of the trailer hitch.

11.    Pursuant to the CBA, all dollies are counterweighted to 70 pounds or fewer.

12.    Franklin estimates most dollies weigh between 45 and 60 pounds, although some are counterweighted to fewer pounds.  (Ex. 16).

13.    Whether and when Franklin lifts dollies depends on UPS's needs and his supervisor's instructions.

14.    UPS requires its Feeder Drivers to use both hands when lifting dollies.  (Ex. 123).

15.    Although they are not primarily responsible for handling packages, Feeder Drivers are expected to handle packages if requested by dispatch supervisors or UPS customers.  (Exs. 12, 13).  Feeder Drivers are often alone when they travel to customers' sites and must be able to lift packages without assistance if necessary.  Neither UPS nor the Feeder Drivers know which customers will require package assistance prior to arrival at the customer's site.

16.    Feeder Drivers are only expected to handle packages without assistance that weigh up to 70 pounds.  (Exs. 12, 13).

17.    Franklin handles packages weighing up to 70 pounds in his position as a Feeder Driver.

18.   UPS instructs Feeder Drivers to primarily lift weight with their legs, not with their backs or arms.  (*See* ex. 149).

19.   Franklin's usual and customary duties as a Feeder Driver require him to lift up to 70 pounds one or two times daily.  (Ex. 105).

20.   When Franklin lifts a dolly, he primarily uses his left arm to steady and balance the dolly, while bearing a majority of the weight with his right arm.  However, lifting a dolly involves some degree of weight bearing with his left arm.

21.   Feeder Drivers are also occasionally expected to maneuver palates by using palate jacks to load and unload trailers, and open and close trailer doors.  (Ex. 143).

22.   Certain of UPS's customers have manual palate jacks, as opposed to hydraulic palate jacks, which require manual pushing and pulling to maneuver.  These represent fewer than 3% of UPS's customers.

23.   To safely enter and exit tractor cabs, Feeder Drivers are required by UPS to maintain three points of contact with the tractor railing at all times – two hands and one foot or two feet and one hand.  (Exs. 123, 142, 144).  This requirement exists to promote safety and lessen fall frequency should a driver lose his or her grip or footing on one point of contact.

24.   The hand rails on tractor cabs are required by the Department of Transportation to be able to bear at least 35% of a driver's body weight.

25.   Franklin weights approximately 240 pounds.  (Ex. 44).  Thirty-five percent of his body weight is 85 pounds.  Franklin enters and exits the cab of his tractor numerous times on each run.

26.   Injuries sustained while lifting dollies or entering/exiting tractor cabs account for 65-70% of all workplace injuries to Feeder Drivers at UPS.

**B.   Franklin is Involved in a 2008 Accident and Returns to Work**

27.   On August 20, 2008, Franklin was injured in a work-related accident while he was traveling with another driver on a run from California to Texas.  Franklin was not at fault in the accident.

28.     The next day, Franklin saw a physician and was released to work without medical restrictions.  (Ex. 19).

29.     Franklin missed a total of approximately eight days of work due to minor injuries sustained in the accident.

30.     Franklin did not modify the manner in which he performed his duties when he returned as a Feeder Driver after the accident.

31.     Franklin continued to fulfill his duties as a Feeder Driver throughout 2008 and 2009.

32.     After returning, Franklin did not miss any scheduled days of work in 2008 or 2009 due to the injuries he sustained in the 2008 accident.

33.     Franklin filed a workers' compensation claim in conjunction with his injuries on April 21, 2009.

34.     Franklin's supervisors were not aware of any deficiencies in his performance during 2008 and 2009, and Franklin considered himself capable of performing his job during this period.

35.     On May 8, 2009, an orthopedic doctor, Dr. Mitchell H. Geiger, M.D., stated that Franklin was "able to perform his usual and customary work" and "has been instructed to return to full duty with no limitations or restrictions."  (Ex. 27).

36.     Franklin reported shoulder pain to Dr. Geiger.  (Ex. 30).

37.     On July 10, 2009, an Agreed-to Medical Examination ("AME") in connection with Franklin's workers compensation claim was conducted by Dr. Ronald N. Kent, M.D., Ph.D., who concluded that Franklin's "disability" had "reached maximum medical improvement and can be considered as permanent and stationary."  (Ex. 33).   Dr. Kent noted that "Franklin has returned to his current duties as a feeder driver for UPS, with a loss of only 9 days of work."  (*Id.*).

38.     Franklin did not report shoulder pain to Dr. Kent.  (Ex. 35).

39.     In 2008, Franklin earned gross wages from UPS in the amount of $107,833.64.

40.     In 2009, Franklin earned gross wages from UPS in the amount of $102,329.77.

**C.     Dr. Woods Issues April 2010 AME Report**

41.     On April 12, 2010, Franklin underwent an AME with Dr. Richard I. Woods, M.D.

42.     Franklin told Dr. Woods during the examination that his customary job duties required him to occasionally squat, crawl, crouch, kneel, push and pull and frequently bend, stoop, climb and reach above shoulder level.  (Ex. 44).

43.     Dr. Woods prepared an "Orthopaedic Agreed Medical Examination," dated April 12, 2010, ("Woods Report") stated that "Mr. Franklin has reached Maximal Medical Improvement as of June 9, 2009, per his treating physician Dr. Geiger."  (Ex. 44).

44.     The Woods Report also stated:  "The patient requires work accommodations consisting of heaving lifting, forceful pushing and pulling, and repetitive overhead work with the left upper extremity" and "based on these work accommodations, he can continue his usual and customary duties."  (Ex. 44).  "Usual and customary duties" meant the duties that Franklin told Dr. Woods that he performed.

45.     The Woods Report noted that Franklin "can lift 30-40 pounds."  (Ex. 44).

46.     The specific measurements and tests included in the Woods Report indicate that Franklin's then-present injuries were relatively minor.  For example, the Woods Report noted only a 1% impairment in Franklin's left shoulder.

47.     Franklin is right-handed.

48.     Franklin was not aware that the Woods Report contained work restrictions at the time it was written, and continued to perform his job as a Feeder Driver after his evaluation.

49.     On June 3, 2010, UPS Risk Management Specialist Mauricio Maravilla received an e-mail from outside workers compensation administrator, Gallagher Bassett, which stated:  "Please be advised that AME, Dr. Wood [sic], has provided following permanent work restrictions for the above mentioned EE [Owen Franklin]:  No heavy

-6-

lifting, forceful pushing, pulling, repetitive overhead work with the left upper extremity. Please advise whether WR [work restrictions] can be accommodated."  (Ex. 47).

50.     Maravilla's responsibilities at UPS included communicating with Gallagher Bassett.  When he received permanent work restrictions for an employee, Maravilla's custom and practice was to forward those restrictions to the employee's manager. Maravilla was not trained on the Americans with Disabilities Act, the California Fair Housing and Employment Act, or the Family and Medical Leave Act.

51.     Maravilla's custom and practice in 2010 was also to notify Bethany Duncan, UPS's Occupational Health Supervisor for the Southern California District, at the time he received restrictions so that she could determine whether to initiate what UPS calls the "ADA Process."  Maravilla understood that Duncan was responsible for spearheading the process of accommodating employees with permanent work restrictions.

52.     Part of Duncan's responsibilities as the Occupational Health Supervisor for the Southern California District in 2010 included working with employees to clarify restrictions, identify possible accommodations, and oversee and lead the ADA Process on UPS's behalf.  Duncan was also responsible for determining whether UPS employees with permanent work restrictions could safely remain on duty throughout the ADA Process.

### D.     Franklin is Removed from Duty

53.     Maravilla e-mailed Duncan regarding Franklin's restrictions nearly four weeks after receiving the initial e-mail from Gallagher Bassett, on June 29, 2010 at 5:26 pm.  His e-mail to Duncan stated: "Owen Franklin Sr is a feeder driver out of Ontario.  He was seen by an AME on 6/3/10 and was given these permanent work restrictions: **No heavy lifting, forceful pushing, pulling, repetitive overhead work with the left upper extremity**.  This employee has never gone Lost Time or TAW [Temporary Alternate Work] for his 8/20/2008 injury.  The employee is currently on vacation this week, but he has been working the last three weeks.  Should the operations be accommodating his work restrictions?  Should he be sent an ADA packet and continue to work?  Or should he be

pulled off his job?  Please let me know if we should be accommodating his work restrictions."  (Ex. 51) (emphasis in original).

54.    Maravilla included the fact that Franklin did not miss work and was never reassigned because he considered it important for Duncan to consider in assessing Franklin's restrictions.

55.    Maravilla did not communicate to Duncan Dr. Woods' statement that Franklin could perform his usual and customary duties.

56.    Duncan received Maravilla's e-mail on June 29 or June 30, 2010.  She understood the permanent restrictions conveyed to apply to Franklin's upper left extremity – his left arm.

57.    Duncan did not consider the implications of Maravilla's statement regarding lost time when she read his e-mail, and it did not play a role in her decisions going forward.

58.    Duncan responded to Maravilla on June 30, 2010, at 11:10 a.m., stating: "We need to ask the Feeder Manager for his work group a couple of questions:  Does proper entry and exit of the tractor cab involve the use of the left arm/shoulder?  Does Owen's route require him to load pallets or do any type of pallet-jack work with his arms (either or both)?  Are their [sic] routes that Owen might bid on or be assigned to that would require this type of work?  If the answer to any of these questions is 'Yes' then we cannot work him until he goes through the ADA process.  Because these are permanent work restrictions, he cannot work TAW."  (Ex. 66).

59.    These were the only job-specific questions Duncan posed at any point regarding Franklin's ability to perform his job as a Feeder Driver in light of the permanent restrictions provided by the Woods Report.

60.    In formulating the questions to Maravilla, Duncan did not refer to UPS's written job description for Feeder Drivers and she did not ask others about Franklin's normal work tasks.

61.     Duncan's knowledge of Franklin's job duties as a Feeder Driver was based on her personal experience alone.

62.     The only information Duncan had specifically about Franklin before responding to Maravilla was contained in Maravilla's e-mail.  (Ex. 51).  Duncan did not have access to the entire Woods Report at that time.

63.     On June 30, 2010, at 11:24 a.m., Maravilla forwarded Duncan's e-mail to Scott Laroche, an On-Road Feeder Manager at UPS, adding:  "Please see below.  If the answer is yes to any of the questions below. [sic] Owen cannot work, he will be going through the ADA process."  (Ex. 66).

64.     Laroche responded to Maravilla, indicating "YES" in response to each question.  (Ex. 66).

65.     Laroche did not review UPS's written Feeder Driver job description or research any other Feeder Driver protocols or routes.  Laroche did not contact Franklin to discuss Duncan's questions.  These were the only three questions Laroche considered in assessing the functional impact of Franklin's permanent restrictions.  Laroche was not asked whether Franklin's job duties involved heavy lifting with his left arm, forceful pushing or pulling with his left arm, or repetitive overhead work with his left arm.  Laroche was not asked to identify or assist in identifying possible accommodations for Franklin's permanent restrictions.

66.     At the time he responded to Duncan's questions, Laroche was unaware of any instances following the 2008 accident in which Franklin was unable to perform his job duties as a Feeder Driver.

67.     If Laroche had questions about whether the stated restrictions impacted Franklin's duties as a Feeder Driver, he could have discussed it with Duncan, Regional Safety Manager, Robert Esquivel, or a regional human resources manager.

68.     Maravilla sent an e-mail to Duncan on June 30, 2010, at 11:50 a.m., stating: "below is the reply from the feeder manager.  Please send him an ADA packet."  (Ex. 52).

69.     Maravilla had no authority to direct Duncan to distribute ADA packets.  The decision whether to send an employee an ADA packet was Duncan's alone.

70.     Duncan concluded based on Maravilla and Laroche's responses that Franklin's ability to safely perform the duties of a Feeder Driver may be impacted by the restrictions imposed by the Woods Report.  Duncan concluded that Franklin should be removed from duty during the ADA Process, at least partially in order to prevent exacerbating the conditions that gave rise to Franklin's work restrictions.

71.     Duncan considered the Woods Report to be an implied request for accommodation.  Duncan did not inform Franklin that she considered the Woods Report to be an implied request for accommodation.

72.     Maravilla also sent an e-mail to Laroche on June 30, 2010, at 11:55 a.m., stating:  "Yes please contact [Franklin] and let him know we cannot accommodate his work restrictions.  If he has any questions and he can reach out to Bethany Duncan."  (Ex. 60).  Duncan was informed about this e-mail on July 8, 2010 by Patrick Matsuda, and took no action other than responding to indicate her awareness of the situation.  (*Id.*).

73.      Laroche reviewed Maravilla's e-mail and conferred with his supervisor, Craig Meeker, in order to confirm that Franklin would not be allowed to return to work.

74.     After receiving confirmation from Meeker, Laroche informed Franklin that he would not be allowed to return to work until the restrictions were lifted.

75.     Gallagher Basset sent Franklin a letter on July 1, 2010, stating:  "Your employer does not have work available within your work restrictions.  You will be sent a Supplemental Job Displacement Benefit voucher, which can be used for training or skills enhancement to prepare you for a new job . . . ."  (Ex. 55).

76.     On July 2, 2010, Franklin's attorney and Gallagher Basset's attorney jointly requested that Dr. Woods issue a supplemental AME report after reviewing UPS's written Feeder Driver job description and clarify whether Franklin could perform the duties it described. (Ex. 56).

77.     On July 12, 2010, Duncan e-mailed Maravilla asking whether it would be possible to obtain a complete copy of the Woods Report and indicating that Meeker had raised the issue of a discrepancy in the Report.  (Ex. 61).

78.     Maravilla obtained a copy of the work restrictions contained in the Woods Report on July 13, 2010.  The restrictions stated:  "The patient requires work accommodations consisting of heavy lifting, forceful pushing and pulling, and repetitive overhead work with the left upper extremity.  Based on these work accommodations, he can continue his usual and customary duties.  If further clarification is necessary, please forward a job analysis."  (Ex. 45).

79.     Duncan also received a copy of the work restrictions on July 13, 2010, and recognized the first and second sentences as conflicting.  (Ex. 66).  However, Duncan did not contact Dr. Woods or forward a job analysis to seek clarification.  Duncan also did not contact Gallagher Basset for additional information.

80.     Duncan received a copy of the entire Woods Report later in July.

**E.     UPS Convenes a Grievance Meeting**

81.     Franklin continued to dispute that the work restrictions were proper and that the restrictions interfered with his ability to function safely as a Feeder Driver.  Franklin raised his concerns to union representative David Naylor.

82.     Naylor was worried that UPS improperly removed Franklin from duty but was not aware of the specific restrictions contained in the Woods Report.  Other union and labor managers also expressed concern about the handling of Franklin's restrictions without seeing specific excerpts from the Woods Report.  (*See* exs. 66, 67, 69).

83.     On July 14, 2010, UPS convened a union grievance meeting in Ontario, California that Franklin, Duncan, Maravilla, Meeker, Naylor, Matsuda, and Sam Stewart, a union representative, attended.  Duncan facilitated the short meeting (approximately 15 minutes).  Duncan attempted to convey UPS's decision to remove Franklin from work due to his permanent work restrictions.

84.     There was no discussion at the meeting about whether Franklin could in fact enter and exit a tractor cab safely, operate a dolly safely, lift packages safely, or operate a palate jack safely.  There was no discussion of accommodations, except to the extent that Franklin stated he could continue to do his job without accommodations.

85.     Duncan did not consider the meeting to be part of the ADA Process.

86.     The grievance meeting was the first and only time Duncan met with Franklin.

87.     Franklin brought a full copy of the Woods Report to the meeting, which he retained but allowed others to view.

88.     Franklin stated at the meeting that there was nothing medically wrong with him, the Woods Report should be disregarded, he did not request any accommodations, he never authorized Dr. Woods to restrict him from working, and the restrictions Dr. Woods gave did not actually impact his duties.

89.     At the conclusion of the hearing, Duncan told Franklin that he could only return to work full duty with no restrictions by getting the word "accommodations" removed from the Woods Report.  Duncan did not inform Franklin that he had to engage in the ADA Process to return to work with restrictions.  Duncan did not inform Franklin that he was being placed on a leave of absence.

90.     No one at the meeting suggested that UPS feared Franklin would be unsafe on the road as a Feeder Driver.

91.     By the time UPS conducted the grievance meeting, UPS had already concluded that Franklin could not perform the essential functions of his job based on the restrictions contained in the Woods Report and would not provide him with work until UPS obtained clarification from Dr. Woods about specific, quantitative restrictions. Duncan did not discuss with anyone whether there were open positions at UPS that Franklin could perform in spite of his restrictions.

92.     As of mid-July, 2010, Franklin believed he had been terminated by UPS as a result of the Woods Report and filed a union grievance alleging unlawful termination. (Ex. 64).  Franklin testified that he considered himself terminated as of June 30, 2010.

93.     Franklin's medical benefits were cut off 30 days after his removal from duty.

**F.     UPS Requests and Receives Clarification of the Woods Report**

94.     On July 7, 2010, UPS sent a letter to Franklin, signed on behalf of Duncan, stating:  "On June 30, 2010, we received notification that you requested a job-related accommodation of a self-reported medical condition . . . . In order to assess your request adequately, we need additional medical information regarding your reported condition and the way in which it impacts your ability to work at UPS . . . . Because we cannot continue our assessment of your request until we have received the completed medical forms, it is to your benefit to return this information as quickly as possible, preferably within the next two weeks.  If you fail to return the forms within four weeks of the date of this letter without authorization from me, UPS will consider you to have withdrawn your request."  (Ex. 59).  Franklin did not receive UPS's letter until either July 21, 2010, or July 24, 2010.

95.     On July 15, 2010, in response to the events of the grievance meeting, Franklin wrote to Dr. Woods, enclosing UPS's written job description for Feeder Drivers, and asked him to lift the work restrictions in the Woods Report.  (Ex. 72).  In his letter, Franklin did not indicate any disagreement with UPS's written job description for Feeder Drivers.  Franklin did not send the medical form provided by UPS to Dr. Woods.

96.     After receiving UPS's letter, Franklin called Duncan to discuss its contents.

97.     In spite of the telephone call and the occurrence of the grievance meeting, UPS sent a second letter to Franklin on July 30, 2010, signed on behalf of Duncan, stating:  "On July 7, 2010 UPS sent you a letter acknowledging your recent request for a job-related accommodation and enclosing medical forms to be completed by you and your physician.  Since that time, however, we have not received any communication from you or your physician . . . . If we do not receive your completed forms by August 13, 2010, UPS will consider you to have withdrawn your request and discontinue processing the request at that time."  (Ex. 74).  Franklin did not personally respond to this letter.

98.     The second letter did not inform Franklin that a withdrawal of the accommodation request meant that Franklin could not return to work.

99.    On August 9, 2010, Dr. Woods issued another report, titled "Supplemental Orthopaedic AME Report" ("Supplemental Woods Report") (Ex. 75), which addressed the UPS written job description for Feeder Drivers.  The Supplemental Woods Report was not based on an additional conversation with or evaluation of Franklin.

100.    The Supplemental Woods Report stated that Franklin "cannot perform the job duties as described" but specifically explained that it was "not an actual formal job analysis."  (Ex. 75).  The Supplemental Woods Report did not include quantitative measurements of Franklin's impairments.

101.    UPS received the Supplemental Woods Report on August 12, 2010, and Duncan believed it validated her conclusion that Franklin could not perform the essential elements of his job.  (Exs. 76, 77).

102.    Duncan concluded that the Supplemental Woods Report did not sufficiently address her request for clarification regarding the quantitative aspects of the restrictions contained in the Woods Report, but she did not contact Franklin or Dr. Woods to communicate its insufficiency.  No UPS employee contacted Franklin to alert him of the purported insufficiency of the Supplemental Woods Report.

103.    Duncan believed that the only sufficient response by Franklin would be to complete the medical forms previously sent by UPS or to submit their medical equivalent.  (*See* ex. 67).  Duncan did not communicate this belief to Franklin or Dr. Woods.

104.    Duncan did not explore the possibility of accommodating Franklin's permanent restrictions at any time, either before or after receiving the Supplemental Woods Report.  No other UPS employee explored the possibility of accommodating Franklin's permanent restrictions so that he could return to work.

105.    Duncan's last day working at UPS was September 11, 2010.

106.    Franklin's grievance alleging wrongful termination was closed (listed at "Settled/Withdrawn") in September 2010.  (Ex. 85).

107.    On September 30, 2010, UPS sent a third letter to Franklin stating that, based on Franklin's "failure to submit medical information concerning [his] request for a job-

related accommodation" UPS considered his "request withdrawn" and UPS planned to discontinue "processing" his request.  (Ex. 83).  Franklin did not respond to this letter.

108.   Franklin remained on an unpaid leave of absence at UPS without an expiration date.

109.   After Franklin was removed from work, he experienced emotional distress as a result of his dwindling finances and terminated benefits.

110.   Franklin's benefits were reinstated retroactively in December 2010.

**G.     Franklin Seeks Employment Elsewhere**

111.   Franklin sought employment elsewhere in September 2010 in order to earn an income.  He did so because he believed he had been terminated from UPS and needed to support his family.

112.   Franklin applied for employment as a driver at J.B. Hunt Transport, Inc. on September 28, 2010.  (Ex. 81).  Certain of his statements on the application were inaccurate.

113.   Franklin worked for J.B. Hunt Trucking, Inc., briefly in September 2010 before being hired at Ruan Transport, Inc.  (Ex. 93).  Certain of Franklin's statements on the Ruan application were also inaccurate.

**I.     Franklin's Restrictions Are Lifted and He Returns to Work at UPS**

114.   On September 20, 2011, Franklin filed a complaint with the California Department of Fair Employment and Housing alleging discrimination, wrongful termination, and failure to accommodate.

115.   As part of Franklin's workers' compensation claim, Dr. Woods personally re-evaluated Franklin on September 26, 2011.  Dr. Woods lifted the restrictions on Franklin and replaced them with a prophylactic restriction precluding very heavy lifting.  (Ex. 112).

116.   Franklin requested to return to work at UPS on October 20, 2011, and Franklin returned on October 28, 2011.  Franklin continues to work as a Feeder Driver at UPS.

117.   At no point since returning to UPS as a Feeder Driver has Franklin been unable to perform his duties.

118.   Franklin was later awarded back pay in a union grievance for the time between the date of his September 26, 2011 medical release and the date that UPS reinstated Franklin to active duty as a Feeder Driver.

**H.    UPS's Policies Regarding Disabled Employees**

119.   UPS employees with permanent work restrictions are accommodated on a case by case basis.  (Exs. 12, 22).

120.   UPS has a Temporary Alternate Work program ("TAW") available to workers injured during the course of their employment who have temporary medical restrictions.  The TAW program involves providing temporary work to those employees within the parameters of their temporary work restrictions.  There are many available TAW jobs that are set aside for employees with temporary restrictions.  These include, but are not limited to temporary jobs loading, unloading, sorting, yard work, car wash, cleaning, internal processes, and management.

121.   Workers assigned to TAW generally perform reassignments for up to three months.

122.   Feeder Drivers who are not eligible to drive, for example after being cited for driving under the influence or after having failed a qualification physical, may be provided with temporary assignments inside the Ontario facility.  (*See* ex. 12).

123.   It is UPS's policy to provide employees with alternative employment after receiving permanent work restrictions until a reasonable accommodation decision is reached.  However, employees with permanent restrictions are usually required by UPS to go through the internal ADA Process before returning to work out of concern for employee safety.

124.   It is UPS's policy that the fact of an employee's failure to respond to a medical information request will not stop the ADA Process.

125.   Most employees with permanent restrictions who participate in the ADA Process are accommodated.

126.   Article 14, section 3 of the CBA pertains to permanently disabled employees and provides a mechanism for reassigning employees who can no longer perform their assigned duties.

127.   Pursuant to the CBA, UPS may send any employee to its physician for a legitimate business purpose, particularly to assess the employee's fitness to perform his or her duties.  The CBA also provides a "third doctor procedure" for situations in which UPS's doctor and an employee's doctor disagree.

128.   Under UPS's ADA Process, once medical information regarding restrictions is received, the occupational nurse is supposed to review it for completeness.  If the information is thorough and complete, the file is forwarded to Haidee Lagunday for review.  If the information is insufficient, the occupational nurse is supposed to contact the employee and ask for more information.

129.   Lagunday was never involved in the decision to place Franklin on an indefinite leave of absence.  UPS's ADA Committee was not involved in Franklin's case because his file was never forwarded to them by Duncan.

130.   Lagunday has never seen a case in which an accommodation was flatly denied to a UPS employee without involving the ADA Committee.  It is the ADA Committee's responsibility at UPS to provide final approval of all accommodations or accommodation request denials.

131.   UPS has a policy that leaves of absence cannot be indefinite.

## II. CONCLUSIONS OF LAW

132.   Franklin's claims for relief arise under California's Fair Housing and Employment Act ("FEHA"), with his claim for adverse employment action in violation of public policy premised on the success of at least one of those claims.

### A.   Statute of Limitations

133.   The FEHA has an administrative exhaustion requirement that a plaintiff must lodge a complaint with the Department of Fair Employment and Housing ("DFEH") before initiating a legal action.  Cal. Gov't Code § 12960.  Coupled with the administrative exhaustion requirement is a statute of limitations:  the DFEH complaint must be made within one year of the purportedly unlawful conduct.  *Id.; see also Morgan v. Regents of University of Cal.*, 88 Cal. App. 4th 52, 63, 105 Cal. Rptr. 2d 652 (2000) ("As for the applicable limitation period, the FEHA provides that no complaint for any violation of its provisions may be filed with the Department 'after the expiration of one year from the date upon which the alleged *unlawful practice* or refusal to cooperate *occurred*,' with an exception for delayed discovery not relevant here.") (emphasis in original, citation omitted).

134.   The statute of limitations precludes FEHA claims based on acts that occurred prior to one year before the filing of a DFEH complaint unless the alleged wrongdoing constitutes a continuing violation.  *Morgan*, 88 Cal. App. 4th at 63-64.

135.   A continuing violation exists if "the employer's actions were (1) sufficiently similar in kind – recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence."  *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 823, 111 Cal. Rptr. 2d 87 (2001).

136.   Permanence in this regard means "that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile."  *Id.*; *see also*

*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1059, 32 Cal. Rptr. 3d 436 (2005) (reaffirming the factors articulated in *Richards*).

137.   Courts regularly place the burden of proof on a plaintiff to show a continuing violation.  *See Maridon v. Comcast Cable Commc'ns Mgmt., LLC*, 2013 WL 1786592, at *11 (N.D. Cal. April 25, 2013) ("This Court thus concludes that Plaintiff bears the burden on this issue."); *see also Gardner v. City of Berkeley*, 838 F. Supp. 2d 910, 920 (N.D. Cal. 2012) (finding continuing violation doctrine inapplicable because plaintiff did not sufficiently show permanence); *Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1042, 128 Cal. Rptr. 2d 660 (2002) (placing burden on plaintiff to show triable issue of fact); *Morgan*, 88 Cal. App. 4th at 64 ("[A] plaintiff who shows that a policy and practice operated at least in part within the limitation period satisfies the filing requirements.").

138.   In evaluating the triggering date for the statute of limitations under the FEHA, courts are to consider the date that maximizes the possibility of conciliation between the employer and employee.  *See Romano v. Rockwell International, Inc.*, 14 Cal. 4th 479, 495, 59 Cal. Rptr. 2d 20 (1996) (limitations runs from actual termination, not earlier notification of termination); *McDonald v. Antelope Valley Community College Dist.*, 45 Cal. 4th 88, 108, 84 Cal. Rptr. 3d 734 (2008) ("In *Romano*, we concluded this rule of liberal interpretation favored selecting as the trigger date for the FEHA's statute of limitations the one that would maximize the likelihood of informal employer-employee reconciliation and minimize the need for premature litigation.").

### B.   Disability Discrimination and Perceived-As Discrimination

139.   A *prima facie* case of disability discrimination in violation of the FEHA requires the plaintiff to show that:  (1) the plaintiff suffers from a disability as defined by the FEHA; (2) the plaintiff is otherwise qualified to perform his or her job (i.e. can perform the essential functions the job with or without a reasonable accommodation); and (3) the plaintiff was subjected to an adverse employment action because of the disability. *See, e.g., Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 886, 58 Cal. Rptr. 3d 729 (2007) (listing elements).   In a perceived-as disabled discrimination case, the

first element is modified to require that the plaintiff show he or she was mistakenly regarded as disabled.  *See* Cal. Gov't Code § 12926.1(d)(3) (extending protection "when an individual is erroneously or mistakenly believed to have any physical or mental condition that limits a major life activity."); *see also Jensen v. Wells Fargo Bank,* 85 Cal. App. 4th 245, 259-60, 102 Cal. Rptr. 2d 55 (2000) (requiring mistaken belief of disability for perceived-as claim).

140.   Relevant evidence in determining essential functions of a job includes written job descriptions, amount of time spent performing a function, consequences of not performing a function, terms of an applicable collective bargaining agreement, and work experience of other past and present employees.  *See* 9-C Chin, Weisman, Callahan & Exelrod, *Cal. Practice Guide Employment Litigation* ¶ 9:2247.2 (The Rutter Group 2012). If an employee cannot perform an essential function of a job without endangering himself or others, the employee is not considered a qualified individual.  Cal. Gov't Code § 12940(a)(1) ("This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.").

141.   A reasonable accommodation is "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired."  *Nadaf-Rahrov v. The Neiman Marcus Group, Inc.*, 166 Cal. App. 4th 952, 975-976, 83 Cal. Rptr. 3d 190 (2008).

C.     **Failure to Reasonably Accommodate**

142.   The FEHA makes it unlawful for an employer "to fail to make reasonable accommodation for the known physical or mental disability" of an employee.  Cal. Gov't Code § 12940(m).  "The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential

functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability." *Scotch v. Art Institute of California*, 173 Cal. App. 4th 986, 1009-10, 93 Cal. Rptr. 3d 338 (2009) (citation omitted).  "As with a FEHA discrimination claim, the plaintiff bears the burden of proving that he or she had the ability to perform the essential functions of a job with accommodation." *Lui v. City and County of San Francisco*, 211 Cal. App. 4th 962, 972, 150 Cal. Rptr. 3d 385 (2012) (affirming rejection of discrimination and accommodation claims).

### D.    Failure to Engage in a Timely, Good Faith, Interactive Process

143.   The FEHA makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee" to "determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n).  But "[t]o prevail on a claim under section 12940, subdivision (n) for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred." *Scotch*, 173 Cal. App. 4th at 1018; *see also Nadaf-Rahrov*, 166 Cal. App. 4th at 984.

144.   Two earlier decisions by the California Court of Appeal could be read to indicate that a failure to engage claim does not depend on the existence of an articulable reasonable accommodation.  *See Wysinger v. Automobile Club of Southern California*, 157 Cal. App. 4th 413, 424-25, 69 Cal. Rptr. 3d 1 (2007) (upholding jury verdict that found a failure to engage but no failure to reasonably accommodate); *Claudio v. Regents of Univ. of California*, 134 Cal. App. 4th 224, 248-49, 35 Cal. Rptr. 3d 837 (2005) (allegations of total failure to engage in interactive process survive summary judgment motion where interactive process may have revealed reasonable accommodation). However, the court in *Scotch* reconciled these decisions with the later-decided *Nadaf-Rahrov* in light of the FEHA's remedial purpose by holding that, at the trial phase, an

employee *must* be able to identify reasonable accommodations in order to prove the requisite element of harm. *Scotch*, 173 Cal. App. 4th at 994.

145.   This holding is facially consistent with *Claudio* and logically consistent with *Wysinger*, which held that a jury could find a failure to engage and no failure to reasonably accommodate because the parties may not have reached the state at which an accommodation would be required. *Wysinger*, 157 Cal. App. 4th at 425.  The *Scotch* court reasoned that employees would have sufficient access to information throughout litigation to identify a reasonable accommodation and questioned what conceivable remedy a jury could provide if harm was not articulated in terms of a possible reasonable accommodation that was foreclosed by the denial of a good faith interactive process. *Scotch*, 173 Cal. App. 4th at 1019; *see also Dickinson v. Allstate Insurance Co.*, 2013 WL 1695574, at *4 (Cal. App. 4th April 19, 2013) (applying *Scotch*); *Kesecker v. Marin Community College Dist.*, 2012 WL 6738759, at *11 (N.D. Cal. Dec. 31, 2010) (same); *Kranson v. Federal Express Corp.*, 2012 WL 4715337, at *11 (N.D. Cal. Oct. 1, 2012) (same); *Westerlund v. Landmark Aviation*, 2010 WL 3171044, at *4 (C.D. Cal. Aug. 9, 2010) ("California courts have held that without the possibility of a reasonable accommodation through the interactive process, there are no damages to support a failure to engage claim."); *Scott v. City of Yuba City*, 2009 WL 4895549, at *11 (E.D. Cal. Dec. 11, 2009) (applying *Scotch*).  The Court concludes the holding in *Scotch* is a well-reasoned interpretation of California law, supported by the policies of the FEHA and the canons of statutory construction.

### E.    Wrongful Termination in Violation of Public Policy

146.   To constitute a termination in violation of public policy, the subject policy must be enshrined in constitutional or statutory provisions.  *See City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159, 77 Cal. Rptr. 2d 445, 959 P.2d 752 (1998) (listing elements).  A plaintiff's common law claim for relief therefore depends on a predicate constitutional or statutory violation.  *Id.*

### III.   **APPLICATION OF LAW TO FACTS**

**A. Statute of Limitations**

147.   Franklin filed a complaint with DFEH on September 20, 2011, alleging discrimination, wrongful termination, and failure to accommodate.  Consequently, unless Franklin shows the existence of a continuing violation, actions and omissions that occurred prior to September 20, 2010 are time-barred.  Nearly all of the relevant conduct occurred in June, July, and August 2010.  The only arguably relevant act that occurred after September 20, 2010 was the September 30, 2010 letter ("September 30 Letter") from UPS to Franklin informing him that UPS considered his request for accommodation withdrawn.  Franklin does not argue that the September 30 Letter, in and of itself, severed from UPS's actions during the summer of 2010, constitutes a violation of the FEHA.

148.   Rather, Franklin argues that there was a continuing violation until the September 30 Letter such that UPS's conduct between June 30, 2010 and September 19, 2010 is actionable.  In order to avoid the statute of limitations, Franklin must show either a company-wide policy or practice *or* a series of related acts that had not acquired permanence.

149.   Under California law as articulated by the California Supreme Court, this is a very close question on the facts.  With a reluctance overcome by ambiguity in the evidence and a policy of liberal interpretation of the FEHA, the Court concludes that Franklin has sufficiently shown a series of related, impermanent acts continuing into the statutory period.

150.   Regarding a company-wide policy or practice, Franklin argues but does not establish that UPS has a "100% healed" policy for its employees.  The facts of this case show the contrary.  The existence of the TAW program, utilized by UPS employees, directly undermines Franklin's claim because its explicit purpose is to provide work to employees with temporary restrictions.  Apparently in the alternative, Franklin argues that UPS has an unwritten "100% healed" policy as to employees with permanent restrictions only.  This argument also fails because it is unsupported by evidence, and the facts

adduced at trial show that at least some UPS employees with permanent restrictions are returned to work with accommodations in spite of permanent medical restrictions. Whether or not UPS individually held Franklin to a "100% healed" standard, Franklin fails to establish that UPS has a company-wide practice of applying that standard to its employees.

151.   But Franklin (narrowly) establishes a continuing violation through a series of related acts that did not acquire complete permanence prior to September 20, 2010.  In other words, a reasonable employee in Franklin's position may have considered further informal attempts to obtain reasonable accommodation worthwhile after September 20, 2010.

152.   The futility of future informal proceedings was arguably apparent at various points in time well before September 20, 2010.  Franklin was removed from duty in June 2010 and his benefits were terminated 30 days later.  Meetings and discussions with UPS and its representatives in July 2010 were unsuccessful from Franklin's point of view. UPS stated its position and maintained it, unwavering:  Franklin would not be allowed to work due to the restrictions contained in the Woods Report.  To the extent the decision to remove Franklin from duty constituted discrimination, failure to provide reasonable accommodation, or failure to engage in the interactive process, the decision occurred in June 2010 and was re-confirmed in July 2010.  The issuance of the Supplemental Woods Report in August 2010 resulted in no further action by UPS.  In spite of the clarity of these events, Franklin urges the Court to conclude that UPS's failure to act on the Supplemental Woods Report was the final event in a continuing violation, arguing that UPS's failure to act was only apparent to Franklin after he received the September 30 Letter.

153.   In light of the intended flexibility of the FEHA and public policy of encouraging informal resolution, the Court finds that a reasonable person in Franklin's position may have considered discussions with UPS to be viable after September 20, 2010.  While Franklin testified that he considered himself terminated as of June 30, 2010, filing a labor grievance in July 2010 for wrongful termination, he did not seek other

employment until September 28, 2010.  And although his application to J.B. Hunt on September 28 undermines the argument that Franklin considered further discussions with UPS useful up until September 30, it is ambiguous whether, in days leading up to his J.B. Hunt employment application, Franklin or a reasonable employee in his position would have reached that conclusion.

154.   That is to say it is not clear precisely **when** a reasonable employee would have considered UPS's silence to have terminated informal discussions.  This ambiguity provides a basis to conclude that a reasonable employee would not have considered informal discussions to be useless after September 20, 2010.  A reasonable employee in Franklin's position could have been awaiting word from UPS until receipt of the September 30 Letter, and Franklin himself presented evidence that he was awaiting UPS's decision at least until he applied to J.B. Hunt on September 28.  Accordingly, the Court finds that Franklin has offered sufficient evidence of a continuing violation, which did not acquire permanence over one year before he filed his DFEH complaint.  Franklin's FEHA claims are therefore timely under California Government Code section 1296.

B. **Disability Discrimination and Perceived-As Discrimination**

155.   This case turns on the essential duties of the Feeder Driver position and whether or not Franklin could safely perform them.  The ability to lift up to 70 pounds unassisted is an essential function of the Feeder Driver position.  The Feeder Driver's written job description lists as essential the ability to "[l]ift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds".  (Ex. 15).  The written job description was developed with the input and approval of the workers' union and the 70-pound requirement is also enshrined in the applicable CBA.  (Ex. 12 at 155).

156.   If a Feeder Driver is not able to safely lift a package or manipulate equipment weighing up to 70 pounds, UPS's fundamental business goals of safe and timely package delivery are undermined.  The inability to safely lift a package or manipulate equipment may cause injury, delay, inefficiency, customer dissatisfaction, and improper equipment usage.

157.   Although Franklin testified that he never lifts packages, he also testified that he does, in fact, lift up to 70 pounds as a Feeder Driver.  (Tr. at 148:19-23).  This admission is further corroborated by the annotated essential functions list that Franklin sent to Dr. Woods to use in preparing the Supplemental Woods Report – on the standard written job description, Franklin added handwritten notes indicating that he handles weight between 45 and 60 pounds.  (Ex. 16).  In other words, before the initiation of this litigation, Franklin conceded that his job required him to lift between 45 and 60 pounds, even though Dr. Woods previously noted that Franklin could only lift 30 to 40 pounds.  And when Dr. Woods was given the written job description annotated by Franklin, Dr. Woods concluded that Franklin "could not perform the job duties as described."  (Ex. 75).

158.   Franklin's only argument that lifting 70 pounds is non-essential is based on the fact that Franklin was never subject to disciplinary action or negative feedback about his job performance after the 2008 accident.  While it is true that Franklin performed his duties to the satisfaction of his supervisors between 2008 and 2010, that fact does not lead to a conclusion that Franklin was *safely* performing his duties, a factor employers are entitled to consider.  Cal. Gov't Code § 12940(a)(1).  Indeed, the deterioration of Franklin's physical health between 2008 and 2010, a fact otherwise unexplained by the parties, could easily have been the result of Franklin's inability to safely perform the essential duties of his job.

159.   The Court therefore concludes that the ability to lift up to 70 pounds unassisted is an essential function of the Feeder Driver position.  Franklin could not safely perform that function without accommodation according to Dr. Woods, and Franklin has

-26-

failed to show that a reasonable accommodation existed that would have allowed him to do so.

160.   Franklin identified three possible accommodations at trial:  (1) UPS should have recognized that Franklin's actual duties did not implicate Dr. Woods' restrictions; (2) UPS should have modified the essential functions of Franklin's job; and (3) UPS should have assigned Franklin to TAW.  Under the facts of this case and the law of California, these proposed accommodations are not reasonable.

161.   With respect to the first proposed accommodation, the Court has found that the ability to lift up to 70 pounds unassisted is, in fact, an essential element of the Feeder Driver position.  Because the proposed accommodation is contrary to the findings of the Court, it cannot be considered reasonable.

162.   Having concluded that the ability to lift up to 70 pounds unassisted is essential, Franklin's second proposed accommodation is unreasonable under California law because reasonable accommodations do not include eliminating essential functions of existing jobs.  2 Cal. Code Regs. § 7293.9(d)(3).

163.   Finally, although a reasonable accommodation may include reassignment to a vacant position for which the employee is qualified, employers are not required to create new positions by making temporary positions permanent.  *See Raine v. City of Burbank*, 135 Cal. App. 4th 1215, 1227, 37 Cal. Rptr. 3d 899 (2006) ("[A]n employer has no duty (absent perhaps workplace precedent suggesting its reasonableness) to accommodate a disabled employee by making a temporary accommodation permanent if doing so would require the employer to create a new position just for the employee.").  Nor are employers required to violate seniority rules of collective bargaining agreements in accommodating their employees.  *See Willis v. Pacific Maritime Association*, 244 F.3d 675, 680-81 (9th Cir. 2001) ("[A]n accommodation that is contrary to the seniority rights of other employees set forth in a CBA would be unreasonable *per se*.").

164.   Franklin's injuries were permanent and stable, and Franklin has not identified any vacant, permanent job for which he was qualified.  Because UPS was under no duty to

1  create a permanent position in order to accommodate him, the third proposed

2  accommodation is not reasonable.

3      165.   Accordingly, Franklin has not shown that he was a qualified individual under

4  the FEHA, and UPS prevails on Franklin's discrimination claim.

5      166.   Franklin also did not show by a preponderance of the evidence that UPS held

6  a *false* belief that he was disabled, entitling UPS to judgment on Franklin's perceived

7  disability claim.  By acknowledging an employee's medical restrictions, an employer does

8  not automatically concede that the employee is disabled under the applicable statute or

9  that it regards the employee as such.  *See Thornton v. McClatchy Newspapers, Inc.*, 261

10 F.3d 789 (9th Cir. 2001) (awareness of restrictions does not necessarily prove a company

11 regarded an employee as disabled).  Moreover, if UPS in fact regarded Franklin as

12 disabled, its conclusion was not erroneous since the valid medical restrictions put in place

13 by Dr. Woods substantially limited Franklin's ability to work as a Feeder Driver.

14      **C. Failure to Reasonably Accommodate**

15      167.   Because Franklin has not shown that he could perform the essential functions

16 of his job with a reasonable accommodation, UPS must prevail on his claim for a failure

17 to reasonably accommodate.

18      **D. Failure to Engage in a Timely, Good Faith, Interactive Process**

19      168.   It is apparent that UPS caused the breakdown in the interactive process by

20 failing to respond to the Supplemental Woods Report.  UPS was steadfast in its position

21 that Franklin could not work without further medical clarification.  Further medical

22 clarification concluded that Franklin could not perform the essential elements of his job as

23 defined by UPS.  UPS received this clarification, and UPS's internal policies dictated that

24 it should be acted upon, either by escalating Franklin's case for review or by contacting

25 Franklin to request additional information.  But UPS did not acknowledge the

26 Supplemental Woods Report to Franklin, indicating that it stood by its decision to remove

27 Franklin from duty.  Franklin had done the only thing he believed was required of him to

28 ameliorate the situation and proceed informally, but no further informal proceedings

-28-

occurred.  Although Franklin failed to provide the exact form requested by Duncan, Franklin also made considerable attempts to seek clarification from Dr. Woods, and those attempts went unrecognized by UPS.  Moreover, it was UPS's policy that the ADA Process should not stall based on the singular failure of an employee to return a particular form.  UPS's decision not to contact Franklin regarding the insufficiency of the Supplemental Woods Report therefore terminated the informal dealings of the parties, diverging from UPS's ordinary practices and obligations under the law and resulting in the ultimate breakdown of the interactive process.

169.   But, in light of the Court's conclusion that Franklin did not articulate a reasonable accommodation that could have been provided had the process continued, Franklin has not shown that he suffered harm, an essential element of a failure to engage claim.  As a result, UPS is also entitled to judgment on this claim for relief.

### E. Wrongful Termination in Violation of Public Policy

170.   Franklin does not prevail on his claims under the FEHA so he cannot prevail on his claim for adverse employment action in violation of public policy.  Accordingly, UPS is entitled to judgment on this claim.

## IV.  **VERDICT**

The Court finds and rules as follows:

1.  On Plaintiff's Claim 1 for discrimination in violation of the FEHA section 12940(a) based on disability or perceived disability:  In favor of Defendant.

2.  On Plaintiff's Claim 2 for failure to accommodate disability in violation of the FEHA section 12940(m):  In favor of Defendant.

3.  On Plaintiff's Claim 3 for failure to engage in a timely good faith interactive process in violation of the FEHA section 12940(n):  In favor of Defendant.

4.  On Plaintiff's Claim 4 for adverse employment action in violation of public policy:  In favor of Defendant.

5.  On Plaintiff's Claim 5 for violation of California Civil Code section 3294:  In favor of Defendant.

6.  On Plaintiff's Claim 6 for attorneys' fees and costs in accordance with California Government Code section 12965(b):  In favor of Defendant.


The Court will enter a separate judgment pursuant to Federal Rule of Civil Procedure 54 and 58(b).

Dated:  July 3, 2013

MICHAEL W. FITZGERALD
United States District Judge